214 So.2d 838

**Eric Ronald WILLIAMS**

v.

**STATE of Alabama.**

**1 Div. 517.**

Supreme Court of Alabama.

Oct. 17, 1968.

Vernon Z. Crawford, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and Leslie Hall, Asst. Atty. Gen., for the State.

**144**

COLEMAN, Justice.

Defendant was convicted of rape and sentenced to imprisonment for life.

We quote from defendant's brief a part of his statement of the testimony given by the victim:

" . . . . (She) testified that she was living alone in one of two apartments in that building. There were three rooms adjoining her apartment which she usually rented out, but which were vacant at that time. (Tr. 145) (She) identified State's Exhibits 23–30 inclusive as being photographs of various portions of her house on A Street. (Tr. 146–151) (She) stated that she returned to her house between 12:00 and 12:30 a. m. on the morning of June 29, 1967 and went straight to bed. Prior to retiring (she) said that she checked both the living room door and her back door and she said that the chain was fastened on the back door. (Tr. 154) (She) testified that she was awakened by a voice which said 'Don't move, I have a knife, I'll kill you, all I want is your money.' Then she noticed a knife between her face and the face of her attacker. After warning her not to scream the alleged attacker tied a piece of cloth around her mouth and neck. (Tr. 155) (She) testified again that her alleged attacker warned her not to scream and threatened to kill her. (Tr. 156) (She) then went on to say that she could see the structure of her alleged attacker's face and noticed that he had a stocking over his face. She touched the stocking and then she touched the shirt which she identified as being made of Banlon. She then dropped her hand, she said, and her left hand hit her alleged attacker's belt. (She) testified 'it was like a scallop on the belt.' (Tr. 159) (She) then testified that her alleged attacker lifted his shirt and she could see his skin was dark and the shirt was light. (Tr. 159) (She) then said that her alleged attacker took his knife and ripped her panties off and 'penetrated [her] body.' (Tr. 160) She said her alleged attacker then got up and said 'I gotta get my gloves,' got his gloves, and left. When (she) heard the kitchen door close she said she jumped out of bed and ran and slammed the kitchen door, put the night latch on and ran to the phone and called her brother, Michael, and told him that she had been raped. (Tr. 161–162) She said Michael arrived about three minutes later. On voir dire, (she) admitted that she did not see the belt in question on the night she was allegedly raped. (Tr. 163) The first time she saw the belt was in Dr. Grubbs' office about four days later. (Tr. 164) She testified the first time she felt the belt, marked State's Exhibit 13, was June 29th when she was attacked. (Tr. 164) In response to a question on voir dire (she) testified 'no, sir, I did not say [the belt had] scalloped edges; I said a scallop on the belt.' (Tr. 167) However, on later direct-examination when she was asked how she could identify the particular portion, she said 'by this little scalloped *edge* right here— this scalloped *edge* right here.' (Tr. 169) (She) identified State's Exhibit 11 as being the shirt her attacker wore. (Tr. 172) And she also identified the defendant as the intruder. (Tr. 174) On cross-examination (she) admitted that she could not see her alleged attacker's face. (Tr. 174) She also said that she only saw one shirt on her attacker which he raised up exposing his skin. (Tr. 177, 179) According to her testimony her alleged attacker did not take off his pants. (Tr. 177–178) (She) further testified that she had solid white sheets and pillow cases on her bed the night of the alleged attack. (Tr. 180) . . . . (She) testified that her alleged attacker discharged semen inside her at

the time of the attack. (Tr. 191) . . . ."

The following statement from the state's brief appears to be correct:

"The evidence shows in this case that (the victim) was raped by a dark skinned man wearing a banlon shirt and a scalloped belt about 2:30 O'clock, A.M., and that within the matter of a few minutes the Appellant was found by police officers crouching in the shadows a short distance from (the victim's) apartment. The evidence also shows that his fly was unzipped, he was wearing a banlon shirt and a scalloped belt which was hanging loose, and that his shoes were unlaced."

■ Defendant says his conviction must be reversed for two reasons, first because the court denied his motion to inspect and make copies of the jury rolls or venires for the years 1963 through 1968. During the examination of Mrs. Trott, who has charge of the jury rolls or venires, the record shows the following:

"MR. CRAWFORD: Mrs. Trott, we have here bundles which you brought consisting of jury venire—one, two, three, four, five, six, seven, eight, nine, ten— ten bundles of paper which appears to be the jury venire from 1963 up to about the present date, is that correct?

"A Correct.

"Q Can you tell the Court whether or not you know by looking at any one of the bundles or any sheet in the bundle where there are names of veniremen, whether or not those names are of persons of the male or female sex or are of race classified as non-whites or whites?

"A No, sir.

"MR. CRAWFORD: Your Honor, at this time we move the Court to allow us an opportunity to make a copy of these venires that Mrs. Trott has brought for the purpose of proving our motion that prior to 1963–62, as in the opinion of the

Willie Seals case there was less than two percent Negroes; subsequent to the Willie Seals case that the ratio of Negro males and white males has not changed; that it is approximately less than four percent. Further, that since these venires from 1966 up to the present date, that there is even a smaller percentage of females—white females and Negro females. The only way that we can prove this is by taking venire by venire, week by week, analyzing and finding out whatever way we can and come back to Your Honor and tell you how many of these persons on the venire for the week of March 25th as exhibited by Defendant's Exhibit A, and to tell you that there are a number of Negro males, Negro females, white males and white females; that we will need ample time as quickly as possible to make copies of these, or take these, but I assume that the Court wants these as her records, so if you will allow us either to take these or make copies of them, and we can give you the figures since Mrs. Trott does not know.

"THE COURT: What says the State?

"MR. BOOTH: Judge, Mrs. Trott has testified, of course, it is not designated on these venires—these venire sheets whether they are white or colored—Negro race or white race, and what he is saying is that he wants to show which are white and which are not white. Now, of course, that would necessitate, as it did in the Willie Seals case, weeks while a canvasser went out to every address, to check the individual to find out whether he was a white man or a Negro, and the fact that the jury is drawn by lot wouldn't necessarily reflect the percentage this week or any other particular week, because they are drawn by lot—

"MR. CRAWFORD: May I—

"MR. BOOTH: He had access to all of those prior to Friday or Thursday when he filed this motion because this case has been pending for a long time, as the Court observed this morning, but he's asking now to delay this trial while they check every

person whose name was drawn for jury duty from today on back to 1963. Going out is the only method that he has—the one used heretofore, I think he did heretofore in the Seals case, in which I was involved and which I think this Judge tried one time; where you had to go and check each address—had canvassers to go out and check each address, in fact, you hired Mobile postmen—

"MR. CRAWFORD: Postmens too—

"MR. BOOTH: Anything, to go out and check every one of the men who had been summoned for jury duty in this court for the five or six years; that's the only way anybody can do it.

MR. CRAWFORD: Your Honor, we can do it that way or if Your Honor would permit, we can begin with Mrs. Buck's jury roll by subpoenaing the first name there appearing on page one, Mr. James Herman Aaron, and ask him to come to the witness stand to testify whether or not he is a Negro or white, or whether he is male or female—white or Negro. Now, my suggestion is to allow us to take these or either the jury roll and make copies of it so that the original can remain in the Court House, or let us call these people and identify them because we say—we maintain that there is systematic inclusion and systematic exclusion of Negroes from the jury rolls, further we maintain in our motion that there are systematic inclusions and systematic exclusions of white females, also Negro females on the jury rolls. And now we have this motion, and we offer to prove it.

"MR. BOOTH: In answer to that, he wants this case held in abeyance and delayed while he subpoenas thousands and thousands of names—

"MR. CRAWFORD: Your Honor—

"MR. BOOTH: I didn't interrupt you—into this Court and put each one of them on the stand and question them. He knows full well that he could have done all this heretofore because the last time he had it come up he went into the Federal Court

here, and the Court permitted you to make a copy—the Federal Judge that heard that matter, the District Federal Judge, and make a copy before the trial and go check those names and then bring a witness to the stand who said that he had checked those—

"MR. CRAWFORD: Your Honor—

"MR. BOOTH:—instead of delaying the Court.

"MR. CRAWFORD: Your Honor, this is not for the purpose of delaying this trial. While we are doing this, the trial is still going on as it is going on now and was at the time we struck twelve-thirteen veniremen. This is no purpose for delay. This is our first opportunity; we obtained a copy of the jury venire; and it would have been highly untimely to file such motion prior to the time of receipt of the jury venire, for March 25, 1968, which we did obtain, I believe, on the 21st or 20th of last week—Wednesday of last week, and then diligently and timely we filed our motion on Thursday.

"MR. BOOTH: If he is saying he was diligent in filing his motion—he's speaking of the years 1963 to date; if it were just for the last week or two, but he's had ample time to inquire into all of that by motion long before March of 1968. It's true he might have had to wait until this week's venire was drawn, but he could have inspected every one of them by motion prior to a week ago.

"THE COURT: Anything further?

"MR. CRAWFORD: Yes, sir, it was after we obtained the venire for the week of March 25th, which there was no jury for us to quash before this morning or before we obtained the list. Now, in a perusal of the Defendant's Exhibit A, I determined, based upon my limited knowledge of people in Mobile County, that it was highly, highly deficient in terms of racial population percentage as it relates to women, Negro and white, as it relates to white males and as it relates to Negro

males, so there was no other opportunity for me to do so until this morning. That is one of the reasons why, Your Honor, that I insisted that before we even struck the jury that I have an opportunity to do this. I even suggested, Your Honor, as attempting to aid the Court in terms of saying that we would need time to make copies of this. Now, this is not a delay of the trial. This is still the same trial where the State of Alabama is against Eric Ronald Williams.

"MR. BOOTH: Mr. Crawford, did you say you didn't have an opportunity until today to see whether—to know about whether the races were put on these things?

"THE COURT: I have heard you both out, and I'm ready to rule. I'm going to ask you to accept my ruling.

"MR. BOOTH: Yes, sir.

"THE COURT: My ruling is this: There has been brought into this Courtroom at least five feet of legal papers; the Court would estimate that those things must weigh several hundred pounds. The Court is under the impression that those are the records; that they have been available since 1963; that any citizen of this County has a right to go in there and review those records at any time. Isn't that correct, Mrs. Trott?

"MRS. TROTT: Yes, sir.

"THE COURT: Now, the case has been set for trial; the motion comes on the eve of the trial to stop, take time to reproduce those fifty or seventy-five pounds of records which have accumulated since 1963, the Court is of the opinion that the motion is due to be denied."

The motion to quash the venire was filed March 21, 1968, which was Thursday. On Friday, March 22, 1968, the court set the motion to quash for hearing on Monday, March 25, 1968. The motion to inspect the jury lists was denied at the hearing on March 25 or 26, 1968.

As we understand defendant's statement of the case, he was indicted October 11, 1967. On October 24, 1967, defendant was represented by his present counsel, who appears to have represented defendant vigorously throughout this case. On October 24th, defendant waived arraignment and pleaded not guilty. He reserved the right to file special pleas within twenty days. The court set the case for trial on January 29, 1968.

Counsel for defendant appeared before this court on behalf of defendant and, on January 25, 1968, we granted a writ on defendant's petition.

On January 25, 1968, defendant filed motion for continuance. The trial court granted defendant's motion and set the case for trial on March 25, 1968.

It thus appears that counsel had been representing defendant for approximately five months. One continuance for two months had been granted on defendant's motion. Then, on Thursday before the Monday set for trial, defendant filed motion to quash and to inspect and copy the jury lists. Such inspection and copying would have taken considerable time and further delayed the trial. At the hearing, the trial court said:

"THE COURT: Mr. Crawford, I'm going to say this—now hear me out on this: I am going to rule in this respect, that if you have any living witness in this County, be he friendly or hostile, that you wish to question as to any systematic plan of exclusion, I will not limit you by hours or days or weeks, but to stop now and start reproducing public records which have been available for five years—as you stated that record is six inches high; the Court practically judicially knows that each one has around ten thousand names; the Court is going to decline to let you reproduce all these things at this time, and that phase of the motion is denied."

We are of opinion that the court did not err in denying the motion.

**148**

As we understand it, the evidence does not support the allegation that Negroes had been systematically excluded from the juries as alleged by defendant.

Defendant says, as his second reason for reversal, that the state failed to prove his guilt beyond a reasonable doubt, and because the verdict is against the weight of the evidence.

 We have not found that defendant requested the affirmative charge or that the court refused to give such a charge in his favor. Defendant did file motion for new trial which, in ground 24, contains the statement that the verdict is contrary to the great preponderance of the evidence.

We are of opinion that such conflicts as the evidence presented were properly left to be decided by the jury and that the court did not err in overruling the motion for new trial.

Affirmed.

LIVINGSTON, C. J., and LAWSON and SIMPSON, JJ., concur.